Filed 12/16/25  P. v. Vivero CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VALENTIN VIVERO,<br><br>Defendant and Appellant. | C102942<br><br>(Super. Ct. No. STK-CR-FECOD-2015-0015870) |

After a gang-related shooting in which a rival gang member was killed and four others were injured, a jury convicted defendant Valentin Vivero in 2016 on two gang-related firearm offenses and of being an active participant in a criminal street gang. However, the jury was unable to reach a verdict on more serious charges, and the trial court declared a mistrial as to one count of murder, one count of shooting at an inhabited

dwelling, and four counts of attempted murder. In a second 2017 trial, a jury found defendant guilty of those crimes, found that the murder and attempted murders were willful, deliberate, and premeditated, and also found true various enhancement allegations. The trial court sentenced defendant to an aggregate state prison term of 190 years to life plus one year eight months. This court affirmed the judgment. (*People v. Vivero* (June 8, 2020, C086268) [nonpub. opn.] (*Vivero*).)

In 2023, defendant filed a petition to vacate his murder and attempted murder convictions and for resentencing under Penal Code section 1172.6.[1] The trial court denied the petition at the prima facie stage.

Defendant appeals the denial of his petition for resentencing, claiming (1) the record of conviction does not conclusively demonstrate that he was convicted either as the perpetrator or as a direct aider and abettor; (2) his attempted murder convictions are likely based on a "kill zone" theory that would no longer apply in a retrial of the charges; and (3) his trial counsel was ineffective.

We conclude defendant has failed to establish a prima facie case for relief under section 1172.6. The record of conviction conclusively refutes his allegation that he could no longer be convicted of murder and attempted murder "because of changes to [the murder statutes] made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) We need not determine whether defendant is correct about the continuing viability of the kill zone theory because that theory was not affected by the changes to the murder statutes that the section 1172.6 petition process was enacted to remedy. As for the claim of ineffective assistance, defendant has not established prejudice.

Accordingly, we will affirm the trial court's order denying defendant's section 1172.6 petition.

---

[1] Undesignated statutory references are to the Penal Code.

BACKGROUND

Because defendant's section 1172.6 petition was denied at the prima facie stage, we provide a condensed recitation of the facts based on this court's prior unpublished opinion and the appellate record in that case, portions of which were attached to the People's opposition to the section 1172.6 petition. We do so only to place the jury verdict and jury instructions in their proper context.

At the time of the shooting that gave rise to defendant's murder and attempted murder convictions, two Norteño gangs in Stockton were involved in active hostilities against each other. Those gangs were South Side Stocktone (Triple S) and its offshoot, Triple Six Gangsters (Triple Six). The hostilities involved more than a dozen drive-by shootings, assaults with deadly weapons, and homicides. Defendant was a member of Triple Six. The murder victim, Ray Ortega, was a founding member of Triple S. (*Vivero, supra*, C086268.)

On the one-year anniversary of the death of a Triple S gang member who had been shot and killed, Ortega and several others went to the cemetery to visit his grave. Defendant was also at the cemetery, visiting a different person's grave. Later that night, Ortega and his group went to a house to hang out and drink beer. A barrage of gunfire erupted as Ortega and several others, including three of the attempted murder victims, were in front of the house; a fourth attempted murder victim was inside. Three assault-style weapons fired a total of 58 rounds at Ortega and his group, killing Ortega and injuring the four others. (*Vivero, supra*, C086268.) An SUV matching the description of defendant's vehicle was seen leaving the scene. Sometime after the shooting, defendant told his foster father that he "fucked up." Defendant explained that he and Ortega had "a beef" and that "Ortega put a contract on him." Defendant added that "it was either him or [Ortega] and so it had to be [Ortega]." Defendant said "they drove up" and "got out and started firing."

3

The People filed an indictment charging defendant with, among other crimes, one count of first degree murder and four counts of attempted murder. It was further alleged that each crime was committed willfully, deliberately, and with premeditation. The prosecution's theory was that defendant and at least two others, who were likely also Triple Six gang members, attacked Ortega's group by pulling up to the house and opening fire on Ortega and everyone around him with three assault-style weapons. The prosecutor argued defendant was one of the shooters, but that it did not matter who fired the shots because defendant was guilty of premeditated murder and attempted murder either as the perpetrator or as an aider and abettor to a perpetrator who directly committed the crimes. The prosecutor added: "So either his bullet did it or somebody he was with did it. Doesn't matter. Sometimes those things just can't be proven. Don't have to. Just that he aided and abetted." The prosecutor did not argue that defendant was guilty of felony murder or that he aided and abetted a target crime, the natural and probable consequences of which was murder or attempted murder. And no other theory of imputed malice was pursued.

The trial court instructed the jury on first degree premeditated murder, informing the jury that the crime required a finding that defendant intended to kill, carefully weighed the decision to kill, and decided to kill before completing the deadly act. The trial court also instructed the jury on attempted murder, informing the jury that the crime required a finding that defendant intended to kill. In addition, the trial court instructed the jury to make an additional finding as to whether defendant acted with deliberation and premeditation, i.e., whether defendant carefully weighed the decision to kill and decided to do so before completing the acts of attempted murder. The trial court further instructed the jury on principles of direct aiding and abetting, informing the jury that a conviction based on aiding and abetting required the jury to find, among other elements, that "defendant knew that the perpetrator intended to commit the crime" and "intended to aid and abet the perpetrator in committing the crime."

4

The jury found defendant guilty on one count of first degree premeditated murder, four counts of premeditated attempted murder, and also found various gang and firearm enhancement allegations to be true. However, the jury found not true the enhancement allegation that defendant personally and intentionally discharged a firearm causing great bodily injury or death.

In 2023, defendant filed a petition to vacate his murder and attempted murder convictions and for resentencing under section 1172.6. On the form petition, defendant checked boxes alleging: (1) an indictment was filed against him allowing the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other imputed-malice theory, or attempted murder under the natural and probable consequences doctrine; (2) defendant was convicted of murder and attempted murder; and (3) he "could not presently be convicted of murder or attempted murder because of changes made to [the murder statutes], effective January 1, 2019."

At defendant's request, the trial court appointed counsel to represent him. The People filed an informal response arguing defendant was ineligible for relief because he "was not convicted pursuant to any of the [section] 1172.6 proscribed murder theories." The trial court agreed and denied the petition at the prima facie stage, concluding the record of conviction conclusively demonstrated that "defendant was not prosecuted under the natural and probable consequences theory or any other theory that imputed malice."

DISCUSSION

I

Defendant contends the trial court erred in denying his section 1172.6 petition because the record of conviction does not conclusively demonstrate that he was convicted of murder and attempted murder either as the perpetrator or as a direct aider and abettor.

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) (Stats. 2018, ch. 1015) "altered the substantive law of murder in two areas." (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).) It "narrowed the application of

5

the felony-murder rule" and also "eliminate[d] liability for murder as an aider and abettor under the natural and probable consequences doctrine." (*Id*. at pp. 448 & 449.) Senate Bill 1437 accomplished the latter change by amending section 188 to require, except in cases of felony murder, that "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person solely on his or her participation in a crime." (§ 188, subd. (a)(3); see *Curiel*, at p. 449.) Under the natural and probable consequences doctrine, "a defendant who aided and abetted an intended [crime] could be liable for murder, if the murder was the natural and probable consequence of the intended [crime]. [Citation.] The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime. [Citation.] Senate Bill 1437 ended this form of liability for murder." (*Curiel*, at p. 449.)

"Senate Bill 1437 also enacted former section 1170.95, [now section 1172.6,] which created a procedural mechanism 'for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief' where the two substantive changes described above affect a defendant's conviction. [Citation.]" (*Curiel, supra*, 15 Cal.5th at p. 449.) "Under section 1172.6, 'A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts . . . .' (§ 1172.6, subd. (a).)" (*Id*. at pp. 449-450.)

" '[T]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citation], including that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [the murder

6

statutes] made effective January 1, 2019," the effective date of Senate Bill 1437 [citation].' [Citation.] 'When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition "to determine whether the petitioner has made a prima facie case for relief." [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the defendant has made a prima facie showing of entitlement to relief, "the court shall issue an order to show cause." [Citation.]' [Citation.]" (*Curiel, supra*, 15 Cal.5th at p. 450.)

"We independently review the denial of a resentencing petition at the prima facie stage." (*People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1238.) We must determine whether the record of conviction, which includes "the jury instructions . . . , the jury's verdicts, and the findings accompanying the verdicts" (*id*. at p. 1232), conclusively refutes defendant's allegation that he could no longer be convicted of murder and attempted murder "because of changes to [the murder statutes] made effective January 1, 2019." (§ 1172.6, subd. (a)(3).)

*People v. Estrada* (2022) 77 Cal.App.5th 941 (*Estrada*) is instructive. There, as here, the jury found the defendant guilty of first degree murder with a gang enhancement based on a gang-related shooting, but found not true an allegation that he personally and intentionally discharged a firearm. (*Id*. at p. 944.) Also like this case, the jury was not instructed on felony murder or the natural and probable consequences doctrine. (*Ibid*.) Affirming the trial court's denial of the section 1172.6 petition, the appellate court held: "The record establishes that [the defendant] was convicted of first degree murder as an aider and abettor with intent to kill, and he is therefore ineligible for resentencing . . . ." (*Id*. at p. 945.) That was because Senate Bill 1437 did not eliminate direct aiding and abetting liability for murder and "the jury instructions 'ensured that the jury would only find [the defendant] guilty of first degree murder, even as an aider and abettor, if it concluded he acted willfully and with intent to kill . . . .' [Citation.] Accordingly, to find

7

[the defendant] guilty of first degree murder, which the jury did here, it necessarily found that he acted with intent to kill, not merely that murder was the natural and probable consequences of a nonhomicide crime he committed." (*Id*. at pp. 945-946.)

Here, as in *Estrada*, the jury was not instructed on felony murder or the natural and probable consequences doctrine. And although the jury found not true an allegation that defendant personally and intentionally discharged a firearm causing great bodily injury or death, as in *Estrada*, the jury was clearly and consistently instructed that in order to convict defendant of first degree premeditated murder, either as the perpetrator or as an aider and abettor, he had to have acted with the intent to kill. The same is true with respect to premeditated attempted murder. The record thus conclusively refutes defendant's allegation that he could no longer be convicted of murder and attempted murder "because of changes to [the murder statutes] made effective January 1, 2019." (§ 1172.6, subd. (a)(3).)

Nevertheless, defendant argues we must give preclusive effect to the jury's not true finding on the allegation that he personally and intentionally discharged a firearm causing great bodily injury or death, such that we may not conclude he was one of the shooters. In this appeal we assume (without deciding), for the purposes of our analysis, that defendant was not one of the shooters. But contrary to defendant's argument on appeal, he need not have been one of the shooters to have directly aided and abetted the shooters in committing premeditated murder and attempted murder while possessing his own intent to kill. The jury so found.

II

Defendant next contends that his attempted murder convictions are likely based on a "kill zone" theory that would no longer apply in a retrial of the charges. In making this argument, defendant relies primarily on *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*).

8

In *Canizales*, the California Supreme Court clarified the "contours and limitations" of the kill zone theory of concurrent intent applicable to attempted murder. (*People v. Mumin* (2023) 15 Cal.5th 176, 192 (*Mumin*).) Under that theory, the prosecution "relies on circumstantial evidence to establish that the defendant acted with the specific intent to kill not only the primary target but also everyone in the kill zone." (*Id*. at p. 193.) However, the theory is a "particularly narrow one" that " 'may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death . . . and (2) the alleged attempted murder victim [who was a secondary target] was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm.' [Citation.]" (*Ibid*.)

As defendant accurately observes, the jury was instructed on the kill zone theory in this case. We need not decide, however, whether such an instruction should have been given in light of *Canizales*. A section 1172.6 petition and related appeal are not the proper vehicles for challenging a conviction on grounds unrelated to the changes to the murder statutes made by Senate Bill 1437.

In order to be eligible for relief under section 1172.6, defendant must show he can no longer be convicted "because of changes to [the murder statutes] made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) With respect to attempted murder convictions, defendant is eligible for relief only if he was convicted "under the natural and probable consequences doctrine." (*Id*., subd. (a)(1).) The kill zone theory has nothing to do with the natural and probable consequences doctrine. It does not impute malice at all. Instead, it is a theory that allows the prosecution to use circumstantial evidence to prove a defendant possessed the intent to kill both the intended target and

9

everyone within the kill zone.  (*Mumin, supra*, 15 Cal.5th at p. 193; *Canizales, supra*, 7 Cal.5th at p. 607.)  Senate Bill 1437 did not change the kill zone theory.  Thus, even if defendant is correct that the kill zone theory would no longer apply to his case (an issue we do not decide), that would not be "because of changes to [the murder statutes] made effective January 1, 2019."  (§ 1172.6, subd. (a)(3).)  We must therefore reject defendant's kill zone theory claim.  (See *People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 935 [rejecting claim that ambiguous instructions allowed for conviction on an imputed malice theory because the asserted errors had "nothing to do with these 2019 legislative changes"]; *People v. Burns* (2023) 95 Cal.App.5th 862, 867 [rejecting similar claim that had "nothing to do with the legislative changes to California's murder law"].)

III

In addition, defendant claims he received ineffective assistance of counsel at the prima facie stage of the proceedings.  We assume, without deciding, that due process required effective representation in this context.  (See *People v. Lewis* (2021) 11 Cal.5th 952, 970, 972-973; *Michelle K. v. Superior Court* (2013) 221 Cal.App.4th 409, 450; *Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 710.)

"An ineffective assistance of counsel claim has two elements:  a defendant must show that their counsel's performance was deficient, *and* that this deficient performance prejudiced the defense.  [Citation.]  A reviewing court can begin an ineffective assistance of counsel inquiry with either element and need not address both elements if one is not satisfied.  [Citations.]  Indeed, it is often preferable for a court to dismiss an ineffective assistance of counsel claim solely for lack of prejudice." (*In re Tellez* (2024) 17 Cal.5th 77, 88.)  We take that course here.  The record of conviction conclusively establishes that defendant was not entitled to relief under section 1172.6.  Any asserted unprofessional errors made by appointed counsel did not affect the outcome.

10

# DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.

                                                        /S/
                                                    MAURO, J.

We concur:

     /S/
EARL, P. J.

     /S/
HULL, J.